[Cite as *Laveer v. Laveer*, 2013-Ohio-3294.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| SUSAN L. LAVEER | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff - Appellee | : | Hon. Patricia A. Delaney |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| -vs- | : | |
| | : | |
| RICHARD L. LAVEER | : | Case No. 12 CAF 12 0086 |
| | : | |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Delaware County Court of Common Pleas, Domestic Relations Divison Case No. 09-DRA-11-535

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      July 25, 2013

APPEARANCES:

For Plaintiff-Appellee

EDWARD F. WHIPPS
JESSICA M. WOOD
Edward F. Whipps and Associates
500 South Front Street, Ste 860
Columbus, OH 43215

For Defendant-Appellant

CHRISTOPHER L. TROLINGER
CHELSEA L. BERGER
Farlow & Associates, LLC
270 Bradenton Ave., Ste 100
Columbus, OH 43215

*Baldwin, J.*

{¶1}    Defendant-appellant Richard LaVeer appeals from the November 6, 2012 Judgment Entry of the Delaware County Court of Common Pleas, Domestic Relations Division.

STATEMENT OF THE FACTS AND CASE

{¶2}    Appellant Richard LaVeer and appellee Susan LaVeer were married on April 24, 1993. Two children were born as issue of such marriage, namely, Chase (DOB 9/20/95) and Brooke (DOB 10/9/98). Brooke is a Castle child and has significant medical issues. She requires a gastronomy tube, is wheelchair bound and requires cauterization and has seizures, among other medical issues.

{¶3}    On November 6, 2009, appellee filed a complaint for divorce against appellant. Appellant filed an answer and counterclaim on December 11, 2009. A trial before a Magistrate was held in July of 2010 and a Magistrate's Decision was issued on August 2, 2010. The Magistrate, in his Decision, found that appellant had earned $244,293.00 in 2005, $377,099.00 in 2006, $346,867.00 in 2007, $243,372.00 in 2008 and $293,561.00 in 2009 while he was employed by American Family Insurance and that he was currently receiving unemployment compensation of $503.00 a week. Neither party filed objections to the same.

{¶4}    Pursuant to a Judgment Entry Decree of Divorce filed on September 14, 2010, the trial court found that there was no error of law or other defect on the face of the Magistrate's Decision. The trial court designated appellee residential parent and legal custodian of the children and ordered appellant to pay the entire cost of Chase's extracurricular activities associated with school. In addition, the trial court ordered that

the parties' marital home be sold and that, effective, August 1, 2010, appellant pay the following in lieu of spousal support: (1) first mortgage, taxes and insurance, (2) second mortgage, (3) electric, (4) gas, (5) water, (6) lawn care, (7) home maintenance, (8) car insurance/umbrella, (9) car maintenance and (10) telephone cable internet.   These items totaled $4,234.60.  The trial court, in the Decree, ordered that upon the sale of the residence, spousal support would be $2,000.00 a month subject to review upon appellant's "return to employment". The trial court ordered, in part, that spousal support would terminate if appellee cohabitated with a non-related adult male and retained jurisdiction over spousal support.  A Nunc Pro Tunc Judgment Entry Decree of Divorce was filed on November 19, 2010 to correct the amount of child support that appellant was ordered to pay. No appeal was taken.

{¶5}     On March 25, 2011, appellant filed a Combined Motion Pursuant to Civil Rule 60(B) for Relief from Judgment and Motion to Modify Spousal Support and Terms as Related to Obligations of the Parties Regarding the Real Estate. Appellant, in his motion, alleged that appellee was cohabitating with an unrelated male. Appellant specifically alleged that appellee had been residing in the marital home with Marc Carr since September of 2010 and that she had falsely testified at the time of the final hearing that she was not in a relationship with anyone. Appellant also argued that the second mortgage's balloon payment of $57,133.93 became due and payable on April 1, 2011, that he did not have the financial ability to pay the same and that the only source of funds was his retirement account, which was split equally with appellee. Appellant also argued that he had been unemployed for a prolonged period of time, was employed at a substantially lower salary and had become unemployed again.

{¶6}     Appellee, on June 7, 2011, filed a Motion for Order to Show Cause. Appellee, in her motion, alleged that appellant had failed to reimburse her for amounts she paid for car insurance, car maintenance and home repairs and that these added up to $1,991.43. She further alleged that appellant failed to reimburse her $300.00 for Chase's football fees.  Appellee argued that appellant owed her a total of $2,291.43 for all of these expenses.

{¶7}     A hearing before a Magistrate commenced on August 19, 2011. At the hearing, appellant testified that he became employed on May 1, 2011 by Allstate Insurance. Since May of 2011, he had earned $11,313.11 in commissions, but had to pay a one time $8,000.00 training fee.   Appellant was working as an independent contractor on a 100% commission basis.  Appellant previously had been employed from November 15, 2010 through January 24, 2011 by Wells Fargo at a base salary of $28.85 per hour, which amounts to $60,000.00 a year based on a 40 hour work week, plus commissions. However, his pay stubs show an average of $51,345.00. During the period of time from January 24, 2011 until May 1, 2011, he was unemployed.  Appellant also testified that the marital home was going to be sold for $427,500.00 and that he paid off the second mortgage on the house by withdrawing money from his IRA. He testified that he negotiated a payoff of $46,000.00.

{¶8}     Appellant testified that his 2010 tax return showed that he made $53,844.00 between his payment from Wells Fargo for November and December and unemployment. In addition, he had a $40,000.00 withdrawal from his IRA. Appellant's adjusted gross income, as shown on his 2010 tax return, was $103,855.00. Appellant testified that between the upkeep of his own residence and the martial residence, his

total outflow every month was approximately $8,000.00 month and that he was about $7,000.00 in the hole each month. He testified that he made up the difference by withdrawing money from his IRA.

{¶9} Appellant was questioned about Marc Carr, who he alleged was cohabitating with appellee. He testified that Carr was a friend of theirs and that he became suspicious of the relationship between Carr and appellee in the fall of 2008. Appellant indicated that he had discovered phone calls between the two in the spring of 2009. According to appellant, the relationship between Carr and appellee was going on while the divorce was pending, but was not out in the open. When asked, he testified that the relationship became in the open right after the divorce and that he saw Carr at the house many times. Appellant testified that he heard the two having sex when he went over to the former marital home to get a coat and that Carr was often present at the house when appellant would come by to visit with the children.

{¶10} Appellant testified that he believed that Carr had moved into the house and was staying overnight. He indicated that Carr kept personal belongings there including shoes, clothing, a toothbrush, hair putty and a shaving kit. According to appellant, Carr's truck was constantly parked outside appellee's residence and was in the driveway many days in a row. He further testified that while Carr was occupying the former marital house, he was paying the utilities and the mortgage. Appellant further testified that appellee would sometimes take Carr to work and that Chase told him that Carr lived there. Appellant was unaware if Carr owned his own residence and testified that he had seen Carr at the new residence that appellee had purchased and closed on in May or June of 2011.

{¶11}   Appellant testified that Brooke received 54 hours a week of nursing care and also went to school from 9:00 a.m. to 3:00 p.m. during the school year.  She is taken to school either on the school bus or by appellee. Appellant testified that appellee never went to college and had only worked early on during their marriage. Since Brooke was born, appellee has not worked, although appellant testified that he believed that she had the time and ability to do so.

{¶12}   On cross-examination, appellant testified that subsequent to the Divorce Decree, appellee provided him with a bill for $300.00 so that their son could play football. Appellant testified that appellee paid such bill prior to the Magistrate's Decision, that he knew that appellee paid such bill on August 3, 2010 and that the trial court's decision was made effective on August 1, 2010.  Appellant claimed that appellee never gave him the $300.00 bill until she filed her motion and that he was not going to give appellee the money because she was cohabitating. He also admitted that appellee had submitted to him $1,719.79 in car insurance and maintenance bills and that he had not paid any of them. According to appellant, appellee took the vehicle to a shop owned by a close friend of Carr's. Appellant claimed that the van's tires were replaced unnecessarily, but agreed that he had never mentioned the tires until the time of the hearing and did not investigate whether or not the tires were needed.  Appellant agreed that he refused to pay a $271.64 bill for repair to a refrigerator because it was not home maintenance. Appellant further testified that it was his goal to make $120,000.00 a year with Allstate and that he had been terminated from his previous job with American Family Insurance, where he earned between $230,000.00 and over $300,000.00 a year, for inappropriate business conduct. At the time of the hearing, appellant was looking for

a new job. Appellant also testified that the week after he left Wells Fargo, he traveled to Dallas, Texas to go to the Super Bowl, but did not attend the game.

{¶13}   Appellant agreed that he had paid a private investigative firm to conduct surveillance of appellee to determine if she was cohabitating with Marc Carr. He testified that there were times when they found Carr's vehicle at appellee's residence and times when they did not. He admitted that there was one time when they found Car's vehicle at Carr's home and times when he did not see Carr's truck when he drove by appellee's home.

{¶14}   Jeanne Kanable, the private investigator hired by appellant, testified. Her affidavit, which was Exhibit 37, was a direct summary of what she testified that she had witnessed. In her affidavit, she stated as follows:

1. The white 2006 Dodge Ram Extended Cab Pick-up Truck bearing Ohio License plate [EOF 4960] registered to Marc A. Carr was observed at the former marital residence of 10203 Sage Creek Drive, Galena, Ohio 43021 on the following dates: Thursday, February 3, 2011 at 7:23 a.m.; Saturday, February 5, 2011 at 8:47 a.m.; Tuesday, February 15, 2011 at 8:00 a.m.; Wednesday, February 16, 2011 at 7:40 a.m.; Thursday February 17, 2011 at 6:18 a.m. & Sunday, February 20, 2011 at 6:12 p.m.

2.   Susan LaVeer was observed returning to the former marital residence on Sunday, February 6, 2011 in Marc Carr's Dodge Ram Pick-up Truck at 7:36 a.m.; Susan LaVeer was observed driving Marc Carr in his Dodge Ram to his place of employment at JPMorgan Chase Bank at 1111 Polaris Parkway, Columbus, Ohio 43035 on Monday, February 14, 2011 at 6:53 p.m.; Susan Laveer was observed

picking up Marc Carr at his place of employment on Tuesday, February 15, 2011 at (sic)  returning to the former marital residence with Marc Carr at 7:34 a.m.; Susan LaVeer was observed driving Marc Carr in his Dodge Ram to his place of employment on Tuesday, February 15, 2011 at 6:38 p.m.; Susan LaVeer was observed picking up Marc Carr at his place of employment in his Dodge Ram on Wednesday, February 16, 2011 at 7:15 a.m. and driving back to the former marital residence.

{¶15}   She testified that she conducted her surveillance from January 18, 2011 through February 20th of 2011.

{¶16}   On cross-examination, Kanable testified that she did not see Carr or his truck anywhere in the area on January 18, 2011 and that there was no evidence that he was living with appellee on such date. The next day, she located his truck at his address and it appeared that the truck had been parked there all night. On February 3, 2011, she also located his truck at his address on Talia Court and also found appellee alone on such date. Kanable agreed that on February 3, 2011, she found no evidence that they were living together. On February 4, 2011, Carr's truck was at his address on Talia Court most of the day and, on February 5, 2011, Kanable could not find his truck either at the Talia Court address or at appellee's house.  She further testified that early on February 6th, she did not find any evidence that Carr was at appellee's house, but saw appellee returning to the former marital residence at 7:36 a.m. driving his truck. She did not see Carr.

{¶17}   On February 14, 2011, Kanable saw appellee driving Carr's truck to Chase Bank with Carr in the passenger seat. Kanable testified that appellee was driving

him to work. On February 15, 2011, she saw appellee driving the truck alone and, at 6:16 p.m., saw that there was no truck at appellee's house.  Carr's truck was at his place of work. Later on February 15th, Kanable saw appellee and Carr at a gas station near Chase Bank. Appellee then dropped Carr back off at Chase Bank and took the truck home alone. Kanable testified that on February 16, 2011, she saw appellee drive Carr to work and then leave alone at 7:34 a.m. and drive to her home.  She testified that on February 17, 2011, she saw Carr's truck leaving Chase Bank. Both Carr and appellee were in the truck and appellee was driving.  According to Kanable, on February 19, 2011, she located Carr's truck at his address and, on February 20, 2011, she did not see either appellee or Carr.

{¶18}   On redirect, Kanable testified that on February 3, 2011, appellant was at appellee's house visiting their children. She testified that she was told that appellee and Carr left when appellant arrived to visit the children and that they often stayed at Carr's house together. She also testified that on February 19, 2011, she located Carr's truck at his own address because it was appellant's weekend with the children and appellant stayed in the former marital home.  According to Kanable, on February 15, 2011, Carr's truck was not seen at appellee's house because appellant was visiting with the children. She testified that she saw the truck later and that appellee was driving and dropping Carr off at work. She testified that she concluded that Carr stayed at appellee's house except for the days when appellant visited with the children and that when appellant was visiting, appellee stayed with Carr at Carr's residence.

{¶19}   On recross, Kanable agreed that over a roughly one month period of time, she only saw appellee and Carr together on two occasions and saw Carr at appellee's

residence one time.    She testified that she saw Carr's truck at his own address on the weekends and that when she saw the truck at appellee's house during the week, appellee was driving.

{¶20}   Appellee testified as if on cross-examination. She testified that Carr was her boyfriend and that she had been seeing him since approximately the end of 2010 after the divorce. She denied seeing, dating or having sexual relations with Carr prior to the divorce and testified that during that time, he was just a friend. She testified that Carr's shoes were in her garage and that his toothbrush, body spray, hair putty and clothing were in her house. Appellee also testified that Carr's son's bikes were in her garage and that Carr's tool chest was also there because he was helping her fix up her new house.  Appellee indicated that she did not earn any money in 2010 and did not receive any spousal support during 2010. She stated that she had cashed out her retirement account.

{¶21}   Appellee testified that she had moved into her new home three days before the hearing and that Carr lived on Talia Court with a friend rent-free by helping his friend out. She testified that Carr generally worked 12 hour nights from 7:00 p.m. to 7:00 a.m. and that when she was living in the marital home, Carr slept at her house during the day and sometimes at night. When asked how many days he slept over during a week, she indicated that there were weeks when he was not there at all and times he was there at least three nights or sometimes four. Sometimes Carr was there during the day and not at night.  Appellee testified that he had been over more recently because he was helping her with her new home. She indicated that he probably was staying over five days a week, but just until she got the toilet and sink in her house.

{¶22}  Appellee testified that she occasionally drove Carr to work and that she was not paying him to work on her new house or for any of the renovations. According to appellee, Carr paid her cell phone bill because he got a discount through Chase and did not buy groceries or eat over very often at her house. At times, Carr's children had stayed at the former marital home. Appellee further testified that Carr paid for food when they were dining out about half the time and that she sometimes stayed at Carr's residence when appellant was with the children.

{¶23}  Appellee also testified that appellant, after the divorce, had been paying her household expenses in lieu of support. She stated that he was not responsible for her health insurance and that she was paying for food for herself and the children and gas for the van. Appellant, according to appellee, refused to pay for her car insurance and van repairs and also for repairs to the refrigerator. She stated that Carr was not living with her and had his own place and that chances were that he had never spent a full week with her. She further testified that he had lost his ability to drive due to an OVI and that she sometimes drove him to work.  Appellee indicated that at the present time, she drove Carr to work the majority of the time because he was helping her fix up her house. She occasionally drove Carr's truck. Appellee further testified that a lot of Carr's personal belongings, mainly clothing, were at her house because he had helped her move and was helping her with the house. Carr and appellee do not have a joint account and she testified that he had not paid her any money or transferred any money to her.

{¶24}  At the hearing, Carr testified that he had stayed overnight with appellee at both her new and previous residences. He testified that he worked nights and usually

slept during the day and that the number of days he slept over at appellee's residence varied. Carr indicated that he did not become romantically involved with appellee until after her divorce and that prior to that time, he was friends with the parties and was married himself. According to Carr, he spent a couple of days on average at appellee's residence and did not spend more than 50% of his time there. He stated that he paid her cell phone bill and for dinners when they went out about half the time and that he had stayed at a hotel with appellee a couple of times. Carr, when asked, stated that appellee did not pay anything for him or pay him for working on her new residence and that he had not purchased any items for her house. He testified that he stayed at his apartment rent-free in exchange for helping his roommate with his general contracting business. Carr stated that he did not have any bank or other accounts with appellee and did not have any credit cards jointly with her. While he has clothing at appellee's house, he testified that he generally takes the clothing home with him when he leaves and that he had not spent more than two or three days with appellee other than the last week or so when he was helping her move. According to Carr, nurses who take care of Brooke had called off and appellee had to handle the moving and taking care of Brooke at the same time.

{¶25} On redirect, Carr admitted that he left his toothbrush and hair gel at appellee's house. He testified that he paid for airline tickets when appellee's family came from Arizona, but that he was paid back.

{¶26} Appellee also testified on direct examination, She testified that Brooke's nurse had called off and did not show up for a week and that she was either taking Brooke to the doctor, having to fill her prescriptions, or talking about her surgeries with

doctors. Appellee denied that Carr lived with her and agreed that, on average, he spent two days a week with her but sometimes less. She testified that appellant had not paid any of the bills to date, including the bill for new tires on her van. She stated that she did not have any bank accounts or credit cards with Carr and, with the exception of her cell phone bill, did not receive any financial assistance from him. She also testified that Carr received his mail at either his Talia Court address or his new address and never at her home. She stated that she was not in a relationship with anyone at the time of the divorce.

{¶27} The Magistrate, pursuant to a Decision filed on October 26, 2011, recommended that appellant's Civil Rule 60(B) motion be dismissed, that the motion to terminate spousal support be denied, and that appellant be found to owe appellee $3,901.73 for non-payment of car insurance, auto maintenance, house repairs and Chases's extracurricular activities. Appellant filed objections to the same. Pursuant to a Judgment Entry filed on November 6, 2012, the trial court, with the exception of an objection relating to child support, overruled the objections. The trial court dismissed appellant's 60(B) motion, denied appellant's motion to terminate spousal support and held that appellant owed appellee $3,901.73 for non-payment of car insurance, auto maintenance, house repairs and Chases's extracurricular expenses.

{¶28} Appellant now raises the following assignments of error on appeal:

{¶29} THE TRIAL COURT ERRED IN DETERMINING THAT THERE WAS NO FINANICIAL ASSISTANCE TO ESTABLISH COHABITATION.

{¶30} THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO TERMINATE SPOUSAL SUPPORT ON THE GROUNDS OF COHABITATION.

{¶31} BASED ON THE TOTALITY OF THE CIRCUMSTANCES THE TRIAL COURT'S FAILURE TO MODIFY SPOUSAL SUPPORT WAS AN ABUSE OF DISCRETION.

{¶32} THE TRIAL COURT'S FAILURE TO MODIFY THE INTERIM OBLIGATIONS OF THE PARTIES AS THEY RELATE TO THE REAL ESTATE WAS AN ABUSE OF DISCRETION.

{¶33} THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING DEFENDANT-APPELLANT TO PAY PLAINTIFF-APPELLEE $3,901.73.

{¶34} THE TRIAL COURT IN RULING ON OBJECTIONS ABUSED ITS DISCRETION BY FAILING TO CONDUCT A HEARING PRIOR TO DENYING AND DISMISSING DEFENDANT-APPELLANT'S MOTIONS.

I, II

{¶35} Appellant, in his first assignment of error, argues that the trial court erred in determining that there was no financial assistance to establish cohabitation. In his second assignment of error, appellant argues that the trial court abused its discretion in failing to terminate spousal support on the grounds of cohabitation.

{¶36} Within the context of a divorce decree, "'cohabitation' contemplates a relationship that approximates, or is the functional equivalent of, a marriage." *Keeley v. Keeley,* 12th Dist. Nos. CA1999–07–075, CA1999–08–080, 2000 WL 431362, 1 (Apr. 17, 2000), citing *Piscione v. Piscione,* 85 Ohio App.3d 273, 275, 619 N.E.2d 1030 (9th Dist.1992). In determining whether cohabitation exists, we note the holding in *Moell v. Moell,* 98 Ohio App.3d 748, 752, 649 N.E.2d 880 (6th Dist.1994):

{¶37}  "Many factors may be considered in deciding whether cohabitation exists in a particular set of facts. We previously addressed the issue of cohabitation in *Dickerson v. Dickerson, supra.* In that case, we noted that 'cohabitation' describes an issue of lifestyle, not a housing arrangement. *Dickerson, supra,* 87 Ohio App.3d at 850, 623 N.E.2d at 239[1]. Further, when considering the evidence, the trial court should look to three principal factors. These factors are '(1) an actual living together; (2) of a sustained duration; and (3) with shared expenses with respect to financing and day-to-day incidental expenses.' *Id.* at fn. 2, citing *Birthelmer v. Birthelmer* (July 15, 1983), Lucas App. No.L83–046, 1983 WL 6869. "

{¶38}  In reviewing a case involving domestic violence, the Ohio Supreme Court set forth two primary factors to consider in determining cohabitation:

{¶39}  "Having considered the above definitions of 'cohabitant' and 'family or household member' we conclude that the essential elements of 'cohabitation' are (1) sharing of familial or financial responsibilities and (2) consortium. R.C. 2919.25(E)(2) and related statutes. Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact." *State v. Williams,* 79 Ohio St.3d 459, 465, 683 N.E.2d 1126 (1997).

---

[1] The complete citation is *Dickerson v. Dickerson*, 87 Ohio App.3d 848, 623 N.E.2d 237 (6th Dist. 1993).

{¶40}   This Court examined "whether or not a particular living arrangement rises to the level of a * * * 'cohabitation' " in *Yarnell v. Yarnell,* 5th Dist No. 05CAF0064, 2006–Ohio–3929. We stated that "cohabitation" is a factual question to be initially determined by the trial court. *Yarnell, supra,* at paragraph 43, citing *Dickerson v. Dickerson,* 87 Ohio App.3d 848, 851, 623 N.E.2d 237 (6th Dist.1993). A finding as to cohabitation that is supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Myers v. Garson,* 66 Ohio St.3d 610, 614 N.E.2d 742 (1993). In determining whether competent and credible evidence exists, "[a] reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the testimony." *Bey v. Bey,* 3rd Dist. No. 10–08–12, 2009–Ohio–300, ¶ 15, quoting *Barkley v. Barkley,* 119 Ohio App.3d 155, 159, 694 N.E.2d 989 (4th Dist.1997).

{¶41}   In the case sub judice, we find that the trial court did not err in determining that there was no financial assistance to establish cohabitation and did not abuse its discretion in failing to terminate spousal support on the grounds of cohabitation.  The trial court, as trier of fact, was in the best position to assess the credibility of the witnesses at the hearing. There was no definitive evidence that appellee and Carr were living together for a sustained or other duration. As is stated above, Kanable, the private

investigator, agreed that over a roughly one month period of time, she only saw appellee and Carr together on two occasions and saw Carr at appellee's residence one time. Both appellee and Carr did not deny that Carr sometimes spent the night at appellee's house and that, during her recent move, had spent even more time there in order to assist appellee with remodeling.

{¶42} Moreover, we concur with the trial curt that there was no evidence of financial assistance to establish cohabitation. Carr testified that he did not purchase any items for appellee's new home. Both also testified that Carr maintained a separate residence and that Carr did not receive mail at appellee's home. Moreover, there is a lack of evidence that appellee and Carr shared expenses with respect to financing and day-to-day incidental expenses. Appellee testified that she did not pay any of Carr's bills. The only bill that Carr pays for appellee is her cell phone bill. He testified that he did so because he was able to add appellee to his cell phone plan for $10.00 a month, saving appellee considerable money. Both testified that they did not have any joint bank accounts, credit accounts or other accounts, with the exception of the cell phone account, and that they took turns paying for meals when dining out.

{¶43} Based on the foregoing, appellant's first and second assignments of error are overruled.

III

{¶44} Appellant, in his third assignment of error, argues that the trial court abused its discretion in failing to modify spousal support. We disagree.

{¶45} The modification of spousal support lies in the trial court's sound discretion. *Booth v. Booth*, 44 Ohio St.3d 142, 541 N.E.2d 1028 (1989). An abuse of

discretion indicates that the court's decision was arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "Consequently, when applying this standard, an appellate court is not free to substitute its judgment for that of the trial judge." *Berk v. Matthews,* 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990).

{¶46} "[A] trial court lacks jurisdiction to modify a prior order of spousal support unless the decree of the court expressly reserved jurisdiction to make the modification and unless the court finds (1) that a substantial change in circumstances has occurred and (2) that the change was not contemplated at the time of the original decree." *Mandelbaum v. Mandelbaum,* 121 Ohio St.3d 433, 2009-Ohio-1222, 905 N.E.2d 172, ¶ 33. "[A] change in the circumstances of a party includes, but is not limited to, any increase or involuntary decrease in the party's wages, salary, bonuses, living expenses, or medical expenses." R.C. 3105.18(F).

{¶47} R.C. 3105.18 governs spousal support. Subsection (C)(1) states the following:

{¶48} "In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

"(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

"(b) The relative earning abilities of the parties;

"(c) The ages and the physical, mental, and emotional conditions of the parties;

"(d) The retirement benefits of the parties;

"(e) The duration of the marriage;

"(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

"(g) The standard of living of the parties established during the marriage;

"(h) The relative extent of education of the parties;

"(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

"(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

"(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

"(l) The tax consequences, for each party, of an award of spousal support;

"(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

"(n) Any other factor that the court expressly finds to be relevant and equitable."

{¶49} Appellant, in support of his argument, argues that his return to work and appellee's cohabitation with Carr were substantial changes in circumstances warranting a modification of spousal support. He further argues that the marital home was sold with minor proceeds, forcing him to pay off the second mortgage with his retirement account. Appellant also contends that the trial court found a substantial change in circumstances warranting a modification of child support and that appellee had sufficient time to work.

{¶50} As is discussed above, we find that the trial court did not abuse its discretion in finding no cohabitation. We further find that the trial court did not err in declining to reduce appellant's spousal support obligation under the totality of the circumstances.

{¶51} At the time of the divorce decree, appellant was unemployed. Previously, between 2005 and 2009, appellant's salary had ranged from approximately $243,000.00 to over $300,000.00. In 2010, appellant's employment was terminated for inappropriate business conduct. In the Decree, the court imputed $150,000.00 in income to appellant for purposes of computing child support.

{¶52} At the hearing on appellant's request for modification of child support, appellant testified that, in November of 2010, he was employed by Wells Fargo at a base salary of $60,000.00 a year plus commissions. His employment with Wells Fargo was terminated on January 25, 2011 and, on May 1, 2011, he became employed by Allstate Life Insurance as an independent contractor. Appellant was paid on commission and, at the hearing on his motions, testified that his goal was to earn $120,000.00 a year. Based on such information, the trial court, in computing child support, imputed income to appellant in the amount of $60,000.00 a year and reduced appellant's child

support obligation from $1,830.92 per month to $730.54 per month, effective May 1, 2011.

{¶53}   While appellant argues that because the trial court found that appellant's income was now $60,000.00 and reduced child support accordingly, it should have done so with respect to spousal support, we disagree.  Appellant, in the Decree, in lieu of spousal support, was ordered to pay the two mortgages, the utilities and household expenses that totaled $4,234.60 a month. Once the marital home was sold, he was ordered to pay $2,000.00 a month in spousal support. Thus, his obligation has already been reduced. Moreover, appellant lost his high paying job with American Family Insurance in 2009 due to inappropriate business conduct. In addition, his 2010 tax return shows that his adjusted gross income was $103,855.00.

{¶54}   Moreover, because of the multitude of problems with Brooke, appellee, who does not have a college degree and has not worked since Brooke's birth, is unable to work. Appellee testified that while she had nursing assistance, the nurses were not reliable.  At the hearing, appellee testified that Brooke's nurse called off and did not show up for a week and that Brooke needed surgery to treat her scoliosis. The situation with Brooke has not changed since the time of the Decree. As noted by appellee, "due to Brooke's long list of medical complications and upcoming surgeries,…even if nursing were reliable and school year round, Brooke's medical concerns would all too often require [appellee] to keep Brook (sic) home from school to attend surgery or doctor's appointments with her."

{¶55}   Finally, while appellant argues that his spousal support should be modified because the marital home was sold with minor proceeds remaining and he was forced

to pay the home's second mortgage out of his half of his retirement account, we note that, in the Decree, appellant was ordered to be responsible for any deficiency after the marital home was sold. Appellant did not appeal from the Decree.

{¶56}   Appellant's third assignment of error is, therefore, overruled.

IV

{¶57}   Appellant, in his fourth assignment of error, argues that the trial court erred in dismissing his motion from relief from judgment pursuant to Civ.R. 60(B).

{¶58}   Civ.R. 60 states:

{¶59}   (B) Mistakes; inadvertence; excusable neglect; newly discovered evidence; fraud; etc.

{¶60}   On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(B); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order or proceeding was entered or taken. A motion under this subdivision (B) does not affect the finality of a judgment or suspend its operation.

{¶61}   In order to prevail on a motion for relief from judgment pursuant to Civ.R. 60(B), the movant must demonstrate: (1) a meritorious claim or defense; (2) entitlement to relief under one of the grounds stated in Civ.R. 60(B)(1) through (5); and (3) timeliness of the motion. *GTE Automatic Electric v. ARC Industries,* 47 Ohio St.2d 146, 351 N.E.2d 113 (1976), paragraph two of the syllabus. If any of these three requirements is not met, the motion must be overruled. *Svoboda v. Brunswick,* 6 Ohio St.3d 348, 351, 406, 453 N.E.2d 648 (1983).

{¶62}   The decision to grant or deny a Civ.R. 60(B) motion lies within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Strack v. Pelton,* 70 Ohio St.3d 172, 174, 637 N.E.2d 914 (1994). The term "abuse of discretion" implies that the court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶63}   Appellant, in his motion, alleged that he was entitled to relief from judgment because appellee committed fraud and misrepresentation on the trial court. Appellant contends that appellee intended to move Marc Carr into the home at the time of the parties' divorce, but failed to disclose this to the trial court.  Appellant, in his brief, notes that at the hearing, he testified that he had phone records showing that there was phone contact between the two and also that the two "would hang out just with each other rather than with all of us as couples…" Transcript at 38.

{¶64}   However, even if what appellant claims is true, it fails short of demonstrating that appellee, prior to the divorce, intended to move Carr into the family home and misled the court.  There is no evidence supporting appellant's assertion and,

as is stated above, the trial court did not err in finding that there was no cohabitation. On such basis, we find that the trial court did not err in dismissing appellant's 60(B) motion. The trial court's decision was not arbitrary, unconscionable or unreasonable.

{¶65}   Appellant's fourth assignment of error is, therefore, overruled.

V

{¶66}   Appellant, in his fifth assignment of error, argues that the trial court's failure to modify the interim obligations of the parties as they relate to the real estate was an abuse of discretion.

{¶67}   Appellant argues that the trial court should have modified its order requiring him to pay both mortgages and the utilities in lieu of spousal support because appellee allowed Marc Carr, her "paramour", to live with her and thus benefit from appellant's payment of the same. Appellant also argues that Carr provided financial support to appellee.  Appellant also argues that he had to pay his responsibilities under the interim order using his retirement income because of his low income.

{¶68}   However, as is stated above, we find that the trial court did not err in finding that there was no cohabitation between Carr and appellee.  Moreover, as noted by appellee, appellant provided no proof that he used his retirement income. Finally, as noted by appellee, the Divorce Decree provided that any proceeds from the sale of the marital residence, after the costs of the sale and the debts were paid, would be paid to appellant, including any deficiency. Thus appellant directly benefitted financially from the decrease in the mortgage balance and the maintenance and upkeep of the marital home.

{¶69}   Appellant's fifth assignment of error is, therefore, overruled.

VI

{¶70}   Appellant, in his sixth assignment of error, argues that the trial court abused its discretion in ordering him to pay appellee $3,901.73.

{¶71}   Under the terms of the Divorce Decree, appellant was to pay the entire cost of Chase's extracurricular activities and, until the marital home was sold, was ordered to pay all ordinary maintenance and repairs on the premises.   Appellant also was ordered to pay for car maintenance and insurance.  On June 7, 2011, appellee filed a motion for an order to show cause, alleging that appellant had failed to pay $1,719.79 for car insurance and repairs, $271.64 for home repairs, and $300.00 for Chases' extracurricular fees, for a total of $2,291.43.

{¶72}   With respect to the $300.00 extracurricular fees, appellant, at the hearing, testified that he knew that appellee had paid such bill on August 3, 2010 and that he did not pay the same because appellee paid the bill "prior to the Magistrate making the divorce decision." Transcript at 67.   Appellant argues that, therefore, such fees are not owed by him. Appellant, however, admitted that he knew that such decision was adopted by the trial court and made effective August 1, 2010, which is prior to the date such fees were paid. Appellant, therefore, clearly owes appellee the $300.00.

{¶73}   Appellant also argues that the repair to the refrigerator is not "home maintenance" as ordered by the Decree and that, therefore, he is not responsible for the cost to repair the refrigerator. However, we find that the trial court was free to interpret its own language in the Decree and that it was not unreasonable to   find that the repair of the refrigerator, which was sold with the house, fell within the definition of home maintenance.

{¶74}   With respect to the cost for car repairs, appellant argues that the repair was not done at a repair ship where the vehicle previously had been serviced and was completed at a shop owned by a friend of Marc Carr. Appellant claims that the cost of tires for appellee's van was excessive and an unnecessary expense.

{¶75}   At the hearing, appellant admitted that appellee had submitted $1,719.79 in car insurance and maintenance bills to him and that he had not paid any of them. He further agreed that had never told appellee that he objected to the tire part of the repair bill and testified that he believed that the invoice could have been doctored.  Appellant, however, presented no evidence of doctoring.  Moreover, appellant indicated that he had not paid the car insurance because he did not have an insurable interest in the van even though the court ordered him to pay the same.  Appellant also admitted that the amount owed to appellee had "roughly now grown to about 3,000…" Transcript at 72.

{¶76}   Based on the foregoing, appellant's sixth assignment of error is overruled.

VII

{¶77}   Appellant, in his seventh assignment of error, argues that the trial court, in ruling on his objections to the Magistrate's Decision, erred by failing to conduct a hearing prior to denying and dismissing his objections and motions.

{¶78}   Pursuant to Civ. R. 54(D)(4), when "ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." There is no record demonstration that the trial court did not undertake such a review. We presume that the trial court considered all the evidence. The record does not affirmatively demonstrate that it failed to do so. In fact, in its November 6, 2012

Judgment Entry ruling on appellant's objections, the trial court found that the Magistrate had incorrectly calculated child support and modified that amount of child support that the Magistrate recommended that appellant be ordered to pay.

{¶79} Appellant also maintains that the trial court erred in failing to conduct a hearing on his objections at which additional evidence would be presented. Appellant, on February 16, 2012, filed supplemental objections to the Magistrate's Decision. In his supplemental objections, he requested that he be permitted to present new evidence that he asserted was unavailable at the time of the hearing. Appellant alleged, that since the hearing and prior to the Magistrate's Decision, Carr had been arrested and listed appellee's residence as his residence and that Carr's ex-wife had come forward with additional information that Carr and his kids were living with appellee. Appellant also alleged that Carr's child's car had been parked at appellee's residence constantly.

{¶80} Civ.R 53(D)(4)(d) permits a court to hear additional evidence when the party objecting to a magistrate's decision could not, with reasonable diligence, have produced that evidence for consideration by the magistrate. We find that the trial court did not err in failing to hear additional evidence because appellant failed to show that he could not, with reasonable diligence, have produced the evidence for consideration by the Magistrate. Appellant himself, in his request for additional evidence to be presented, stated that Carr was arrested prior to the Magistrate's Decision. Moreover, as noted by appellee, during the hearing in this matter, appellant indicated that he had spoken with Carr's ex-wife while the divorce was pending. Appellant could have subpoenaed her to testify at the hearing.

{¶81} Appellant's seventh assignment of error is, therefore, overruled.

{¶82} Accordingly, the judgment of the Delaware County Court of Common Pleas, Domestic Relations Division, is affirmed.


By: Baldwin, J.

Gwin, P. J. and

Delaney, J. concur.


_____
HON. CRAIG R. BALDWIN


_____
HON. W. SCOTT GWIN


_____
HON. PATRICIA A. DELANEY


CRB/dr

IN THE COURT OF APPEALS FOR DELAWARE COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| SUSAN L. LAVEER | : | |
| Plaintiff - Appellee | : | |
| -vs- | : | JUDGMENT ENTRY |
| RICHARD L. LAVEER | : | |
| Defendant - Appellant | : | CASE NO. 12 CAF 12 0086 |

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Delaware County, Ohio, Domestic Relations Division,  is affirmed. Costs to appellant.


HON. CRAIG R. BALDWIN


HON. W. SCOTT GWIN


HON. PATRICIA A. DELANEY